# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 23, 2001 Session

## DAVID PATRICK PEARSON v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Knox County
### No. 55338    Richard R. Baumgartner, Judge

---

### No. E2000-00438-CCA-R3-CD
### May 9, 2001

---

The petitioner appeals from the Knox County Criminal Court's dismissal of his petition for post-conviction relief, by which he sought to set aside his earlier guilty pleas. On appeal, the petitioner presses his claim that because he received ineffective assistance of counsel, his guilty pleas were not voluntary and knowing. Finding that the services of the petitioner's trial counsel were below the range of competence demanded of attorneys in criminal cases and that the petitioner was thereby prejudiced, we reverse the judgment of the post-conviction court, vacate the petitioner's convictions, and set aside the petitioner's guilty pleas without prejudice to further proceedings on the underlying charges.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Reversed and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Mark E. Stephens, District Public Defender; and R. Scott Carpenter and Paula R. Voss, Assistant Public Defenders, for the appellant, David Patrick Pearson.

Michael E. Moore, Solicitor General; Patricia C. Kussmann, Assistant Attorney General; Randall E. Nichols, District Attorney General; Marsha L.K. Selecman, Assistant District Attorney General; and Jerry Hall, Special Assistant District Attorney, for the appellee, State of Tennessee.

### OPINION

The petitioner, David Patrick Pearson, appeals the Knox County Criminal Court's dismissal of his 1994 petition for post-conviction relief. He had pleaded guilty in that court in 1990 to thirteen criminal offenses. The petitioner had no agreement with the state about submitting to the charges or about a sentencing recommendation. The trial court imposed a maximum, Range I sentence for each offense and ordered seven of the sentences to be served consecutively, which

resulted in an effective sentence of 80 years. This court reversed in part because of a variety of sentencing errors such that the petitioner's effective sentence was reduced to 77 years incarceration. *See State v. David Patrick Pearson*, No. 03C01-9103-CR-87 (Tenn. Crim. App., Knoxville, Apr. 9, 1992). On Rule 11 review by the supreme court and in a case of first impression, the petitioner's first degree burglary conviction was remanded for calculation of the sentence both before and after the effective date of the Sentencing Act of 1989 and for imposition of the lesser sentence of the two. *State v. Pearson*, 858 S.W.2d 879, 884 (Tenn. 1993). The petitioner complains in his post-conviction collateral attack that his 1990 guilty pleas are invalid because various actions and omissions of trial counsel deprived him of constitutionally effective assistance of counsel. Three years after the post-conviction petition was filed, an evidentiary hearing was conducted. On January 25, 2000, nearly three years after the hearing, the post-conviction court dismissed the petition. This appeal followed. Finding that the services and advice of petitioner's trial counsel were outside the range of competence demanded of attorneys in criminal cases and that the petitioner was thereby prejudiced, we reverse the judgment of the post-conviction court, vacate the convictions, and set aside the petitioner's 1990 guilty pleas.

## A. The Petitioner's Guilty Pleas and Sentencing

The petitioner pleaded guilty to assaulting, raping, and stealing from numerous Knoxville area victims in 1989 and 1990. The stipulated facts underlying the petitioner's guilty pleas and sentencing have been succinctly detailed in this court's earlier opinion from which we borrow.

> On March 31, 1989, Ms. KP was sleeping in her residence in Knoxville. Her boyfriend, WB, was present with her and was also asleep. At approximately 1:30 AM Ms. P woke up to find the [petitioner] standing over her bed with his shorts pulled down. He attempted to climb on top of her and place his body between her legs, but Ms. P began screaming and fighting. Apparently, petitioner was unaware that Mr. B was in the bed also. The ruckus awakened Mr. B. A struggle ensued between [petitioner] and Mr. B, during which, the [petitioner] bit Mr. B several times on the shoulder and back. [Petitioner] then fled.

*See David Patrick Pearson*, slip op. at 1-2 (footnote omitted).

> On February 13, 1990, Ms. AI was in the bathroom of her apartment in Knoxville. The [petitioner] entered her apartment and forced his way into the bathroom. He attacked Ms. I and pushed her into the bathtub with the intent of raping her. While the two were struggling, he hit her in the mouth, injuring her; but she fought back vigorously and bit him on the thumb. During this struggle, the [petitioner] placed his hand between Ms. I's legs and penetrated her vagina with

his fingers. After further screaming and fighting by the victim, the [petitioner] left her apartment.

*Id.*, slip op. at 2-3.

> On the evening of February 28, 1990, Ms. FH was taking a nap in her apartment in Knoxville. At the time, her roommate, MW, was visiting a neighbor. Ms. H woke up to find [petitioner] rubbing against her leg. Ms. H began screaming and attempted to flee, but the [petitioner] began to violently assault her. He struck and bit her numerous times and choked her until she was nearly unconscious. . . . At one point she freed herself from the [petitioner], but he tackled her and pulled her back into the bedroom. [Petitioner] penetrated Ms. H with his fingers and his penis. He also forced his penis into her mouth. The [petitioner] also placed his face in her vaginal area and licked and kissed her there.

*Id.*, slip op. at 3.

> During this series of horrible crimes, the victim's roommate, MW, entered the apartment. The [petitioner] ran to the front area of the apartment and grabbed Ms. W's hair. A struggle ensued, and the [petitioner] chased Ms. W out the front door of the apartment. Holding on to Ms. W's hair, the [petitioner] threw her down to the steps and into some bushes.

*Id.*, slip op. at 4.

> On March 15, 1990, Ms. SD returned to her apartment and noticed a broken window. When she entered her apartment she observed the [petitioner] inside. The [petitioner] removed a camera, some money and other items as he fled the apartment.

*Id.*, slip op. at 4.

> [T]he [petitioner] was arrested on March 15, 1990, [and] his automobile was searched. Found therein was property stolen from at least three different homes. On January 8, 1990, Mr. GG returned to his apartment in Knoxville to find that his apartment had been burglarized during his absence. A metal flask taken during this burglary was one of the items found in the [petitioner's] car. On February 20, 1990, the apartment of JS had been burglarized and two very valuable rings taken during this burglary were found in the

[petitioner's] car. . . . On February 26, 1990, Mr. DP returned to his home to discover that his apartment had been burglarized. A pair of sunglasses taken during this burglary was found in [petitioner's] car.

*Id.*, slip op. at 2.

Knoxville attorney Ellery E. Hill, Jr. was appointed to represent the petitioner. It is Hill's effectiveness that has been questioned. On September 26, 1990, the petitioner appeared for trial on the aggravated burglary, aggravated rape, and assault charges involving Ms. H and her roommate Ms. W. The petitioner entered a not-guilty plea, and jury selection commenced and continued for approximately three hours, at which time the trial court adjourned for lunch.

After the recess, Hill announced that the petitioner desired to plead guilty to all of the non-merging charged offenses, including offenses alleged in an indictment returned by the Knox County grand jury that same day. Hill also stated that the petitioner wanted to plead guilty to additional charges, yet to be determined. The petitioner had no agreement with the state about submitting to the charges or about a sentencing recommendation. The trial court postponed jury selection and conducted a submission hearing. For each offense, the trial court advised the petitioner of the authorized term of imprisonment, the release eligibility percentage, and the possibility of consecutive sentencing. The trial court further advised the petitioner of his trial and appellate rights and that by pleading guilty he was surrendering those rights.

When the trial court inquired whether there had been any inducements for the guilty plea, the petitioner then responded, "Yes," and the following transpired.

> THE COURT: What have they promised you?
>
> DEFENDANT: Thirty years.
>
> THE COURT: Sir?
>
> DEFENDANT: Thirty.
>
> THE COURT: Who has promised you thirty years? (Pause) If you've been promised anything –
>
> DEFENDANT: No, I ain't.
>
> THE COURT: – in regard to sentencing, we need to talk about that?
>
> DEFENDANT: No, ain't nobody promised me nothin'.

-4-

The trial court pressed further, but the petitioner's trial counsel interrupted and suggested that what his client might "ha[ve] in mind" is the thirty percent release eligibility for a Range I standard offender. The remainder of the submission hearing was unremarkable. The petitioner admitted his guilt to the charged offenses. He answered in the affirmative that he was satisfied with his counsel's services and that they had discussed the state's evidence and possible defenses. The trial court accepted the pleas, found the petitioner guilty, and scheduled a sentencing hearing.

A presentence investigation was conducted. The petitioner blamed his situation on marital problems, and the presentence report noted that the petitioner would only discuss the March 15, 1990 burglary. The petitioner told the presentence investigator that he needed money to buy drugs to kill himself "so I broke into someones [sic] apartment[.] I got cauht [sic] an [sic] took to jail then I was accused of other crimes." Shortly before his sentencing hearing, the petitioner wrote a letter to the trial judge, which was made an addendum to the presentence investigation report. In the letter, the petitioner complained that his attorney did not do anything for him and that his attorney "begged me to cop out." The petitioner explained in his letter that he told his attorney "that I didn't want to cop out," and his attorney "got very upset and [told] me that the D.A. was going to stomp him."

The petitioner appeared for sentencing on November 15, 1990. At the beginning of the hearing, the petitioner pleaded guilty to new first degree burglary and assault charges and agreed to be sentenced on them that day. After a series of monosyllabic yes/no responses from the petitioner to the guilty plea litany of questions, the trial court brought up the petitioner's letter complaining about defense counsel and asked the petitioner, "Do you wish to discuss that further?" The petitioner said, "No." The trial court impressed upon the petitioner the seriousness of the situation and again offered the petitioner the opportunity to be heard. The petitioner's only response was a negative "huh-uh." The trial court thereafter accepted the petitioner's guilty plea, heard arguments from the parties, and imposed an effective sentence of 80 years for all offenses.

## B. Post-conviction Hearing

Attorney Hill died sometime in 1996, after the petitioner filed for post-conviction relief but before the evidentiary hearing was conducted in 1997. Six witnesses testified: the petitioner, Knoxville attorney Kenneth Irvine, Jr. who represented the petitioner on his earlier sentencing appeals, a paralegal working for the custodian who was designated to maintain Hill's legal files, Detective Mike Hyde who was the lead investigator on the petitioner's cases, former Assistant District Attorney General David Jennings who prosecuted the cases, and former Knox County Criminal Court Judge Randall E. Nichols who accepted the pleas.

According to the post-conviction testimony, Hill's legal career was short lived. It is believed that he was licensed to practice in 1990, so the petitioner would have been one of his earlier clients. By the time Hill died in 1996, his substance abuse problems were apparent. Mr. Nichols thought that Hill had a bright future in the beginning, but he testified that there was "no question"

but that he later "lost [] confidence in Mr. Hill." From May through November 1993, Hill's law license was suspended for failure to respond to multiple complaints of misconduct lodged with the Board of Professional Responsibility of the Supreme Court of Tennessee.[1] Hill continued to practice law, however, during the suspension period. By order entered January 21, 1994 and after Hill submitted a conditional guilty plea,[2] the supreme court publicly disciplined Hill based on multiple charges of neglecting client matters, failing to adequately communicate with his clients, and failing to adequately communicate with the Board of Professional Responsibility.[3]

After Hill's death, Knoxville attorney Robert W. Ritchie was appointed by the supreme court to take possession and maintain custody of Hill's legal files and to contact Hill's former clients about their files. Hill's files on the petitioner's cases were introduced as exhibits at the post-conviction hearing. Records concerning the disciplinary complaints by other clients and the suspension orders were included.

Knoxville attorney Kenneth Irvine, Jr. became involved with the petitioner when this court appointed him to take over the petitioner's sentencing appeal. Attorney Hill had filed a notice appealing the petitioner's sentences, but thereafter Hill abandoned any further representation. When the petitioner's appellate brief was not filed, this court entered show cause orders directed to Hill on two occasions and also issued an attachment warrant for Hill.

As Mr. Irvine discovered, locating Hill proved to be difficult. When he did, Mr. Irvine requested that Hill provide his files on the petitioner's cases. Although Hill promised to get his files, he never did so. At one point, Mr. Irvine asked Hill about the issues that he had intended to pursue on appeal. Hill stated that he had planned to file an *Anders* brief.[4]

Mr. Irvine testified at the post-conviction hearing that once he started researching the appeal, he discovered many significant sentencing issues. Among the more blatant problems were the petitioner's guilty plea, in one instance, to a misdemeanor charge for which the statute of limitations had expired and the erroneous classification of one of the theft convictions as a Class D, instead of a Class E, felony. Mr. Irvine's efforts resulted in a three-year sentence reduction on two

---

[1] Tenn. R. S. Ct. 9, § 4.2 (all suspensions regardless of duration shall be public).

[2] Tenn. R. S. Ct. 9, § 16.1 (procedure for discipline by consent based on tender and acceptance of conditional guilty plea).

[3] Tenn. R. S. Ct. 9, §18.10 ("The Board shall cause a notice of the disbarment, suspension, disability inactive status, or interim suspension to be given to all state judges, to a newspaper of general circulation in each county in which the respondent attorney maintained an office, . . . and in such other publications as the Board may determine to be appropriate.").

[4] *See Anders v. California*, 386 U.S. 738, 87 S. Ct. 1396 (1967) (setting forth procedure to be followed when appointed counsel is of the considered opinion that there is no basis for an appeal), *limited by Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746 (2000) (*Anders* procedure is not obligatory; it is merely one method of satisfying constitutional requirements).

of the petitioner's convictions, the dismissal of the stale misdemeanor charge, and the correction of one theft conviction to a Class E felony. Following review by the supreme court and that court's remand for resentencing on the first degree burglary conviction, the petitioner's effective sentence was further reduced to 75 years.

In his post-conviction testimony, Mr. Irvine opined "that from what I was able to see, [] there was a great level of incompetence and additional things, like trying to get the file. . . . So the things that I was able to see suggested that it was not handled competently." Mr. Irvine based his opinion on many considerations such as (1) Hill's ignorance about or inattention to offense classifications and applicable statutes of limitations; (2) Hill's acquiescence in having his client plead blindly to charges that had not yet been brought and the specifics of which were unknown; (3) Hill's failure to file a sentencing memorandum on the petitioner's behalf even though the trial judge had invited the parties to do so; (4) Hill's inadequate trial preparation shown by his fee applications for compensation; and (5) Hill's clear intention not to pursue the petitioner's sentencing appeal. The petitioner told Mr. Irvine that it became obvious to him that Hill was not prepared when the trial began and that Hill was "winging it."

Mr. Jennings was called as a witness by the petitioner at the post-conviction hearing. He testified that he firmly believed that he had strong cases on each of the charges against the petitioner. The case on which trial began was, in Mr. Jennings' opinion, the most egregious from the standpoint of injury to the victims, and both victims had identified the petitioner in a lineup. Mr. Jennings recalled telling Hill that he was not going to make an offer on the cases; rather, he was going to try to "max and stack" everything he could.

Mr. Jennings did not know what Hill had done to investigate the cases. Hill's files, however, contain copies of the victims' statements taken by the police and other discovery-type records. Detective Hyde testified that he mailed the witness statements to Hill, and Mr. Jennings explained that he practiced "open file" discovery for the most part. To the post-conviction court it was "obvious" that Hill had struck an agreement to waive preliminary hearings on the charges in exchange for the police files on the cases. Although Hill's files contain copies of forensic reports, some of which reflect inconclusive results, what use, if any, Hill made of the reports and findings is unknown.

At the post-conviction hearing, the state called Mr. Nichols who testified that, as the trial judge who conducted the petitioner's submission hearings, it was clear to him that the petitioner knew what he was doing. Mr. Nichols recalled the letter that the petitioner wrote to him before being sentenced. Mr. Nichols testified that, although given the opportunity at sentencing, the petitioner did not want to discuss whatever complaint he had.

The petitioner's testimony at the evidentiary hearing, as the post-conviction court observed in its order dismissing the post-conviction petition, was "of little value due to the petitioner's inability to articulate his complaints against his trial attorney." The most cogent and

coherent account that the petitioner gave was when he was asked what he remembered about the day he entered his pleas.

> Well, he took me back there in the back. He had done told my mother and my aunt to tell me it would be best if I pled guilty, you know, to these charges; and, *if I made the State take it to trial then they was going to give me three hundred years*. And so they said, if I signed these papers that I would get fifteen years – well, he said he talked to the judge about it, and – uh – he said that the D.A. would probably ask for the maximum. That was twenty-five years, and I asked him, was he sure? And he said yeah.

(Emphasis added).

After the petitioner rested his case, the state recalled David Jennings. Jennings corroborated the petitioner's testimony insofar as Hill's inaccurate advice relative to sentencing. Jennings related that after the plea submission, Hill came up to him outside the courtroom,

> and he made a statement to me that frankly bothered me, but here is what he said. And I have told Ms. Selecman about this since day one, by the way. He said, "David, you can't believe how hard it was for me to convince him he needed to plead guilty, *but when I finally told him the jury would sentence him to three hundred and sixty years*, he realized that he had better go on and do it." If he said that to him, that is obviously two misstatements of the law. He wasn't looking at that much time; the jury hadn't sentenced him, but he did make that statement to me.

(Emphasis added).

The post-conviction court credited the proof that Hill told the petitioner that if he persisted in going to trial, the jury would sentence him to 300 years. The post-conviction court further found that Hill's sentencing advice was "erroneous and deficient." Nonetheless, the post-conviction court concluded that in light of overwhelming evidence of the petitioner's guilt, no prejudice had been demonstrated.

### C. Controlling Law

Pearson's petition for post-conviction relief was filed in 1994, after this court and the supreme court had reviewed his convictions and sentences. The petition, therefore, is governed by our former post-conviction statutory scheme, Tennessee Code Annotated sections 40-30-101 to -124 (repealed 1995), which was replaced in 1995 with the current Post-Conviction Procedure Act,

Tennessee Code Annotated sections 40-30-201 to -222 (1997). *See King v. State*, 989 S.W.2d 319, 323 (Tenn. 1999); *Owens v. State*, 13 S.W.3d 742, 766 (Tenn. Crim. App. 1999).

One significant difference between the current Act and the former statutes is the burden of proof that petitioners must meet. Under the current Act, the standard is "clear and convincing evidence," Tenn. Code Ann. § 40-30-210(f) (1997), whereas under the pre-1995 statutes a petitioner's burden of proving factual allegations was by a preponderance of the evidence. *See State v. Benson*, 973 S.W.2d 202, 207 (Tenn. 1998). Under either version, however, the post-conviction court's factual findings are reviewed *de novo*, consistent with the Rules of Appellate Procedure, with a presumption of correctness unless the evidence preponderates otherwise. *See Jehiel Fields v. State*, — S.W.3d —, — , No. E1999-00915-SC-R11-PC, slip op. at 5 (Tenn., Knoxville, Mar. 15, 2001). The post-conviction court's conclusions of law receive purely *de novo* review with no presumption of correctness. *See id.*, slip op. at 6-7.

## D. Ineffective Assistance of Counsel

The petitioner contends that his guilty pleas were not voluntary and knowing because they resulted from ineffective assistance of counsel. This complaint is premised on a Sixth Amendment right to counsel infringement, not a Fourteenth Amendment general due process violation. *See Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (guilty plea does not comport with due process "if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats'") (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43, 89 S. Ct. 1109, 1712, (1969)).

When a post-conviction petitioner seeks relief on the basis of ineffective assistance of counsel, he must establish that the service rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Also, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. *See id.* at 697, 104 S. Ct. at 2069. "The *Strickland* standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution." *Michael E. Christian v. State*, No. E2000-00922-CCA-R3-PC, slip op. at 9 (Tenn. Crim. App, Knoxville, June 24, 2000); *see State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The scrutiny of counsel's performance must be "highly deferential," and the reviewing court must refrain from concluding "that a particular act or omission of counsel was unreasonable" merely because the strategy employed was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "A fair assessment," the United States Supreme Court has said, entails making every effort to "eliminate the distorting effects of hindsight" and to evaluate the "conduct from counsel's perspective at the time." *Id.*, 104 S. Ct. at 2065. The court promulgated a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, 104 S. Ct. at 2065.

In the petitioner's situation, when there is a claim that ineffective assistance of counsel resulted in a guilty plea, the two-part *Strickland v. Washington* test is modified slightly.

> In the context of guilty pleas, the first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence already set forth in *Tollett v. Henderson*, [411 U.S. 258, 93 S. Ct. 1602 (1973)], and *McMann v. Richardson*, [397 U.S. 759, 90 S. Ct. 1441 (1970)]. The second, or "prejudice," requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

*Hill v. Lockhart*, 474 U.S. 52, 58-59, 106 S. Ct. 366, 370 (1985); *see Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (petitioner must show prejudice by demonstrating that he would not have pleaded guilty but would have insisted upon going to trial).

The modified prejudice standard is necessary because there can be no presumption of reliability "to judicial proceedings that never took place." *Roe v. Flores-Ortega*, 528 U.S. 470, 483, 120 S. Ct. 1029, 1038 (2000). Ineffective assistance, in the guilty plea context, deprives an accused of much more than a fair and reliable trial; it deprives an accused of the judicial proceeding altogether. *Id.*, 120 S. Ct. at 1038. As a result, the petitioner is not *required* to demonstrate that, had he proceeded to trial, he likely would have fared better than he did by pleading guilty; that kind of evidence, nevertheless, can be persuasive that he would have insisted on his right to have a jury determine his guilt of the charges. *See Hill v. Lockhart*, 474 U.S. at 59, 106 S. Ct. at 370 ("In many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial."). This same prejudice standard applies when counsel's deficient performance deprives a defendant of an appellate judicial proceeding. *See Roe v. Flores-Ortega*, 528 U.S. at 485-86, 120 S. Ct. at 1039-40 (defendant required to demonstrate that, but for counsel's deficient conduct, he would have appealed; evidence of nonfrivolous grounds for appeal *or* that defendant had expressed desire to appeal will often be relevant to prejudice inquiry).

The petitioner claims that he forfeited his right to a trial because when the trial began, Hill had not prepared and was "winging it" and because Hill misrepresented to him the sentencing outcome of a jury trial. The post-conviction court made no specific findings about Hill's preparation other than noting that Hill's files contained "virtually all discovery" possessed by the state. We do not have the benefit of Hill's testimony, and no witnesses came forward at the post-conviction hearing to say that Hill could have, but did not, interview them or subpoena them for trial. The petitioner's testimony, moreover, was not helpful. Even so, we have serious reservations whether Hill's preparation was within the range of competence demanded of attorneys in criminal cases. Hill's inaction in the face of a statute of limitations bar to one offense and of a wrong classification

for another offense suggests a ignorance of or indifference to fundamental aspects of Tennessee criminal law. Moreover, there is evidence of a pattern of neglect and inattention by Hill to legal matters, which resulted in the suspension of his law license. Hill entered a conditional guilty plea to multiple charges filed by disciplinary counsel alleging that he had neglected many client matters and had failed to adequately communicate with clients. Hill's abandonment of the petitioner's earlier sentencing appeal is consistent with his pattern of neglect.

Assuming that Hill was unprepared for the petitioner's trial, the petitioner still must demonstrate prejudice by making the connection between this particular deficiency and his decision to forego a trial. We are not convinced that the petitioner has mustered sufficient evidence. In particular, he has not shown why Hill's alleged lack of preparation did not dissuade him much earlier from pleading not guilty and embarking on a trial. The record on appeal does not contain a transcript of the *voir dire* proceedings, and we cannot say that it objectively appears that the petitioner's resolve to continue with his trial was eviscerated by Hill's poor advocacy during jury selection.

On the other hand, this appeal comes before us with the trial court's credibility determination that Hill did, in fact, tell the petitioner that if he insisted in going to trial, he would be sentenced by the jury to 300 years (or 360 years, according to Mr. Jennings). Based on that finding, the trial court concluded that Hill's "performance in advising the petitioner relative to the manner of sentencing and appropriate sentence ranges was erroneous and deficient." We find nothing in the record that preponderates against the trial court's factual finding that the advice was given. Moreover, the trial court's legal conclusion that Hill's advice was erroneous and deficient is unquestionably correct.

Despite Hill's bad advice, the post-conviction court denied relief in this case. "There was," according to the post-conviction court, "absolutely overwhelming evidence of the petitioner's guilt presented at the submission hearing. Simply put the petitioner has failed to prove that, but for counsel's deficient performance, his case would have *resulted in a more favorable outcome*." (Emphasis added.) Because the post-conviction court applied an incorrect prejudice standard, we reverse the denial of the petition for post-conviction relief. In addition, because the record demonstrates a reasonable probability that, but for Hill's eleventh-hour threat of imprisonment for three centuries, the petitioner would not have pleaded guilty and would have insisted that his trial continue, we remand with directions that the petitioner's 1990 guilty pleas be set aside without prejudice to further prosecution or proceedings on the underlying offenses.

The telling point is not that because of overwhelming evidence of guilt the petitioner should have pleaded guilty if properly advised. Rather, as recognized in *Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997), "Even if counsel's advice was erroneous but, nevertheless, the [defendant] would have been wise to plead guilty, a defendant has the right to make a knowing, unwise decision. This Court, or any court for that matter, cannot protect defendants from themselves when it comes decision time."

Here, we need not speculate whether, but for Hill's deficient advice, the petitioner would have insisted on going to trial – the prejudice prong of *Hill v. Lockhart.* The petitioner's trial

already was underway when he changed his plea, and he complained to the trial judge by letter before sentencing that he had not wanted to "cop out." Also, the petitioner's case has an unusual feature relevant to the prejudice inquiry. Assistant District Attorney General Jennings testified that he communicated to Hill his intent to "max and stack" the petitioner's charges and that he would *not* make an offer on the cases. Under these circumstances, there was little incentive for the petitioner to plead blind rather than insist on a trial. Experience teaches that no trial is a sure winner or a certain loser; juries can, and do, occasionally reach results that seem curiously at odds with the evidence.

Had Hill advised the petitioner that he could come out no worse by going to trial than by pleading without an agreement, the petitioner reasonably could have insisted on "taking his chances" with a jury. Hill, however, distorted the options to make it appear that, if convicted at trial, the defendant would come out much worse than if he pleaded guilty. Pleading guilty, therefore, was falsely portrayed as having distinct advantages over going to trial. The petitioner's plea, we believe, was the result of one part ignorance, one part coercion, and one part blatant threat – all of which can be traced directly to Hill's ineffective assistance of counsel.

In light of the foregoing and the record as a whole, we reverse the judgment of the post-conviction court, vacate the petitioner's convictions, and set aside the petitioner's 1990 guilty pleas without prejudice to further proceedings on the charges.

_____
JAMES CURWOOD WITT, JR., JUDGE